| | | |
|---|---|---|
| KEITH E. LEVINE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INFORME HEALTHCARE, LLC, and | ) | **Case No. 26-cv-1320** |
| INFORME HEALTHCARE | ) | |
| MANAGEMENT, LLC d/b/a INFORME | ) | |
| HEALTHCARE, | ) | |
| | ) | |
| Defendants. | ) | |

---

## COMPLAINT

---

COMES NOW, the Plaintiff, KEITH E. LEVINE, by and through counsel, who hereby files this Complaint against the Defendants, INFORME HEALTHCARE, LLC, and INFORME HEALTHCARE MANAGEMENT, LLC d/b/a INFORME HEALTHCARE, and would show unto this Honorable Court as follows:

1. Plaintiff, Keith E. Levine, is a citizen and resident of Knoxville, Knox County, Tennessee.

2. Defendant, Informe Healthcare, LLC, is a limited liability company formed in the State of Wisconsin, with its principal office address at 2741 W. Layton Ave, Suite 106, Milwaukee, WI 53221, and it may be served with process through its Registered Agent, Jodi Czernejewski, 2741 W. Layton Ave., Suite 106, Milwaukee, WI 53221.

3. Defendant, Informe Healthcare Management, LLC, d/b/a Informe Healthcare, is a limited liability company formed in the State of Wisconsin, with its principal office address at 2741 W. Layton Ave, Suite 106, Milwaukee, WI 53221, and it may be served with process

through its Registered Agent, Jason Kilmer, 5351 Asher Village Drive, Ooltewah, TN 37363. Additionally, its Registered Agent in the State of Wisconsin is Jodi Czernejewski, 2741 W. Layton Ave., Suite 106, Milwaukee, WI 53221.

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because it involves claims arising under Federal law, to-wit: False Claims Act, 31 U.S.C. § 3729, *et seq.*, and pursuant to the doctrine of Supplemental Jurisdiction, 28 U.S.C. § 1367.

5. Venue is proper under the code provisions of 28 U.S.C. § 1391.

6. This action is brought pursuant to the provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

7. At all times material hereto, Defendants were employers engaging in an industry affecting commerce.

8. At all times material hereto, Defendants were subject to the provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*

9. At all times material hereto, Defendants were subject to the provisions of 18 U.S.C. § 287 – False, Fictitious or Fraudulent Claims.

10. At all times material hereto, Defendants were subject to the provisions of 18 U.S.C. § 1347 – Health Care Fraud.

11. Violations of the above-referenced statutes can subject Defendants and/or its employee(s) to civil and criminal penalties.

12. The above-referenced statutes were enacted to protect the public health, safety, and welfare.

13. The above-referenced statutes reflect clear and unambiguous statements of public policy.

2

14. At all times material hereto, the Defendants were employers engaging in an industry affecting commerce.

15. At all times material hereto, the Defendants participated in the government healthcare programs, such as Medicare, Medicaid, and TRICARE/CHAMPUS, 10 U.S.C. § 1071, *et seq*., and other government-funded healthcare programs (collectively hereinafter "Government Payors"), and they billed and received money from Government Payors.

16. At all times material hereto, the Defendants have contracted with healthcare systems, such as hospitals, clinics, and inpatient rehabilitation facilities ("IRFs"), to provide medical providers, such as physicians and nurse practitioners, to care for patients.

17. At all times material hereto, to be eligible to receive payments for providing rehabilitation and therapy services, the Defendants must comply with the requirements of the Medicare and Medicaid programs.

18. Under Medicare, the Government Payors reimburse IRFs, such as Defendants, for costs expended on therapy and rehabilitation services that are provided to qualifying Medicare beneficiaries based on the amount of resources the IRF is expected to spend to rehabilitate the beneficiaries pursuant to a per-discharged prospective payment system, and, because the amount of reimbursement to the IRF is tied to the amount of resources the IRF is expected to use for the beneficiaries' rehabilitation, higher disability ratings at admission result in higher reimbursement.

19. IRF rehabilitation therapy and services must meet the reasonable and necessary criteria to be eligible for reimbursement from Government Payors like Medicare, which includes key decision points considered and documented when making a decision to admit, retain, or discharge an IRF patient; certain pre-admission requirements; a post-admission physician

evaluation to verify the patient's admission; and specific requirements for an overall plan of care for each individual.

20. To be considered reasonable and necessary IRF therapy and rehabilitative services by Government Payors, the medical providers at IRFs must determine in relevant part, that the patient: (A) Is medically stable to benefit from IRF services but continues to require 24/7 medical and nursing care; (B) Needs the coordinated care of multiple therapy disciplines unique to IRFs; (C) Benefits from the intense rehabilitation therapy programs unique to IRFs; (D) Requires close medical supervision to manage the medical conditions to support participation in an intense rehabilitation therapy programs; (E) Possesses the cognitive ability to understand commands and retain information; and (F) Is able to tolerate three (3) hours of therapy five (5) days a week and make measurable improvement during their IRF stay.

21. Government Payors will only reimburse IRFs for reasonable and necessary services when the above criteria are met. Failing to comply with the above criteria in order to receive payment from Government Payors, such as Medicare, is a violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*. (hereinafter "FCA").

22. At all times material hereto, the Defendants are owned in part and operated by its CEO, Jodi Czernejewski.

23. At all times material hereto, Jodi Czernejewski has been an agent and employee of Defendants.

24. From July 1993 to January 31, 2025, Jodi Czernejewski was licensed as a Speech-Language Pathologist in the State of Wisconsin, according to the Wisconsin Department of Safety and Professional Services' database *available at* https://license.wi.gov/s/licenseView?id=0cE3d0000000ZmXEAU.

4

25. Plaintiff received his W-2s in 2023 and 2024 from Defendant Informe Healthcare, LLC, and Plaintiff's W-2 in 2025 from "Informe Healthcare."

26. Plaintiff has been a licensed Nurse Practitioner since 2014, and has been licensed to practice in the State of Tennessee as a Nurse Practitioner since July 2023 and as a Registered Nurse since June 2023.

27. Plaintiff began working for Defendant Informe Healthcare, LLC in October 2023 pursuant to an Employment Agreement dated March 20, 2022. (*See* Plaintiff's Employment Agreement, dated March 20, 2022, attached hereto as Exhibit 1 (with "Exhibit A" and "Exhibit B" thereto attached, but other exhibits to the Employment Agreement omitted due to their containing sensitive information).

28. Plaintiff's Employment Agreement dated March 20, 2022 (at Exh. 1) automatically renewed for additional one-year periods.

29. Plaintiff and Defendants had the expectation that the Employment Agreement dated March 20, 2022 (Exh. 1) would continue to thereafter automatically renew every year.

30. At all times material hereto, the Defendants were owned and operated by the same individual, CEO, Jodi Czernejewski, and she was an agent and/or employee of both entities; therefore, Defendants are Plaintiff's joint employers and/or single employer and/or integrated employer.

31. Throughout Plaintiff's employment, he provided care to patients recovering from serious injuries and medical conditions, such as strokes, brain injuries, neurological conditions, trauma, and the like, at a large inpatient rehabilitation facility ("IRF") located in Knoxville, TN (hereinafter "IRF hospital in Knoxville, TN").

32. On December 17, 2023, Defendants' founder and CEO, Jodi Czernejewski,

5

formally offered Plaintiff the position of Clinical Program Coordinator at the IRF hospital in Knoxville, TN, to be effective January 8, 2024.

33. Plaintiff accepted the position of Clinical Program Coordinator at the IRF hospital in Knoxville, TN, effective January 8, 2024.

34. Plaintiff becoming the Clinical Program Coordinator at the IRF hospital in Knoxville, TN, was considered a promotion for Plaintiff.

35. Plaintiff received a pay increase as a result of becoming the Clinical Program Coordinator at the IRF hospital in Knoxville, TN.

36. CEO, Jodi Czernejewski, told Plaintiff that he was receiving the promotion to Clinical Program Coordinator because of his positive performance and because she wanted him in charge of training the newly hired employees.

37. Defendants offered, and Plaintiff thereafter accepted, the "Second Amendment to Employment Agreement" dated December 15, 2023. (Plaintiff's "Second Amendment to Employment Agreement" (with redactions to customer's names, and "Exhibit C" thereto omitted because it contains customer information), attached thereto as Exhibit 2).

38. Although Plaintiff does not have a signed copy in his possession, he signed the Second Amendment to the Employment Agreement (at Exh. 2) after Defendants presented him with the agreement.

39. Plaintiff's "Compensation Structure" for the Clinical Program Coordinator position provided, in part: "Beginning January 8, 2024 (effective date of third amendment), EMPLOYEE shall assume the role of full time employee as well as acting in Clinical Program Coordinator" at the IRF hospital in Knoxville, TN "and providing internal medicine (IM) and rehab services. EMPLOYEE shall receive as compensation the following…. • Shift requirement

remains at 14-16 shifts per month (182 shifts per year) based on a rotation of 7 on 7 off, (12-hour shift) alternating with other providers for a total of 26 weeks per year of coverage. All other conditions of shifts remains in full force from prior Agreement…." (Plaintiff's "Second Amendment to Employment Agreement" at Exh. 2).

40. As Clinical Program Coordinator, Plaintiff was contracted to work the 7 days on and 7 days off schedule. (*See* Exh. 2).

41. During his employment, Plaintiff worked the 7 days on and 7 days off schedule.

42. During his employment, Plaintiff earned at least one merit raise.

43. During his employment, Plaintiff was eligible for bonuses based on his production, such as for the bills that he submitted on behalf of his patients.

44. During his employment, Plaintiff performed his job duties in a competent and satisfactory manner.

45. During his employment, Plaintiff was never written-up or disciplined for any reason.

46. During his employment, Plaintiff did not receive any formal performance evaluations, but he was regularly complimented for his positive performance, including by the CEO and owner, Jodi Czernejewski.

47. During Plaintiff's shifts at the hospital, he primarily reported to and was supervised by the supervising Nurse Practitioner, Bethany White.

48. At all times material hereto, Bethany White was an agent and employee of Defendants.

49. During Plaintiff's shifts at the hospital, he also reported to and was supervised by the physicians working on his shift, such as, but not limited to, Dr. Raul Vasquez-Garagatti, Dr.

Lindsay Patterson, Dr. Sameh Naguib, and Dr. Anthony Cabrera.

50. At all times material hereto, Dr. Raul Vasquez-Garagatti was an agent and employee of Defendants.

51. At all times material hereto, Dr. Raul Vasquez-Garagatti had the authority to discipline and terminate Plaintiff.

52. At all times material hereto, the physicians and nurse practitioners employed by Defendants, including Dr. Raul Vasquez-Garagatti, Dr. Lindsay Patterson, Dr. Sameh Naguib, Dr. Anthony Cabrera, Bethany White, and Plaintiff, submitted claims for services provided to beneficiaries of Government Payors.

53. At all times material hereto, the physicians and nurse practitioners employed by Defendants, including Dr. Raul Vasquez-Garagatti, Dr. Lindsay Patterson, Dr. Sameh Naguib, Dr. Anthony Cabrera, Bethany White, and Plaintiff, were licensed medical practitioners providing services to beneficiaries of Government Payors, and were therefore subject to the laws and regulations of the Centers for Medicare & Medicaid Services ("CMS").

54. At all times material hereto, the physicians and nurse practitioners employed by Defendants, including Dr. Raul Vasquez-Garagatti, Dr. Lindsay Patterson, Dr. Sameh Naguib, Dr. Anthony Cabrera, Bethany White, and Plaintiff, provided medical care to beneficiaries of Government Payors, including Medicare and Medicaid.

55. At all times material hereto, the physicians and nurse practitioners employed by Defendants, including Dr. Raul Vasquez-Garagatti, Dr. Lindsay Patterson, Dr. Sameh Naguib, Dr. Anthony Cabrera, Bethany White, and Plaintiff, were required to comply with the Federal laws and regulations in connection with providing medical care to beneficiaries of Government Payors, as well as submitting claims for services provided in connection therewith.

8

56. At all times material hereto, the physicians and nurse practitioners employed by Defendants, including Dr. Raul Vasquez-Garagatti, Dr. Lindsay Patterson, Dr. Sameh Naguib, Dr. Anthony Cabrera, Bethany White, and Plaintiff, were required to document in the Government Payor beneficiaries' medical records that the IRF care was reasonable and necessary, including by completing a Pre-Admission Screening detailing and documenting the necessary care, an individualized overall plan of care, a post-admission physician exam and evaluation, an IRF patient assessment instrument, and the interdisciplinary team meetings, among other requirements.

57. At all times material hereto, the physicians and nurse practitioners employed by Defendants, including Dr. Raul Vasquez-Garagatti, Dr. Lindsay Patterson, Dr. Sameh Naguib, Dr. Anthony Cabrera, Bethany White, and Plaintiff, were prohibited from submitting claims to and receiving reimbursement from Government Payors for any services not actually provided to Government Payor beneficiaries.

58. Shortly after Plaintiff was hired, he discovered that one of Defendants' physicians, Dr. Raul Vasquez-Garagatti (hereinafter "Dr. Raul Vasquez"), who also provided care to patients at the IRF hospital in Knoxville, TN, routinely and consistently engaged in conduct that violated the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as hereinafter described.

59. After Plaintiff was hired by Defendants, it took about six months to get him credentialed as a provider authorized to submit claims to Government Payors.

60. After Plaintiff was credentialed, in or around early 2024, he was able to login to review the entire medical records and bills submitted on behalf of specific Government Payor beneficiaries, and he confirmed that Dr. Raul Vasquez had submitted claims to Government Payors for payment but failed to include the required documentation detailing that the IRF

admission and care were reasonable and necessary.

61.     Therefore, beginning in or around June 2024, up through the date of his termination as hereinafter described, Plaintiff objected to and attempted to stop Dr. Raul Vasquez's ongoing failure to appropriately document and bill for services, as required by law prior to receiving payment from Government Payors.

62.     In or around June 2024, Plaintiff initially raised his concerns about Dr. Vasquez to Plaintiff's direct supervisor, Nurse Practitioner, Bethany White, but, in response, White only acknowledged that she knew it was an issue and took no further action to address the concerns.

63.     Thereafter, on multiple different occasions, Plaintiff complained to the Defendants' physicians and providers, such as Dr. Lindsay Patterson as well as to his direct supervisor, Nurse Practitioner, Bethany White, about Dr. Vasquez's conduct, including that he was billing for services that he never provided, but, in response, it was only acknowledged that this was a known issue and no action was further taken to address the concerns described herein.

64.     In late-2024, CEO, Jodi Czernejewski, informed Plaintiff that he was eligible for bonuses based on his production.

65.     In late-2024, Plaintiff did not receive as much in bonuses as he was supposed to receive because Dr. Raul Vasquez was billing for the services that Plaintiff actually provided, thereby causing Defendants to submit false claims to Government Payors.

66.     In late-2024, Plaintiff further complained to CEO, Jodi Czernejewski, that he was handling the vast majority of patient admissions. In response, Czernejewski stated in part: "You should not be doing all of the admissions that should be going to the physician" and "I'm a little concerned that you're doing all the admissions that's not supposed to be working [sic] and Dr. Vasquez is aware of that."

67. In late-2024, Plaintiff further complained to CEO, Jodi Czernejewski, that he told Dr. Vasquez to "do at least a couple of assessment and plans" due to Plaintiff's workload. In response, Czernejewski stated in part: "This is not supposed to be how it's supposed to work", "[t]his is how we lost providers before so this needs to change immediately", and "[i]t is very unfair that you are doing all the admissions."

68. In January 2025, Dr. Lindsay Patterson warned Plaintiff that if he continued to complain about Dr. Raul Vasquez, then Defendants were going to go after him and he may end up losing his job because the founder and CEO, Jodi Czernejewski, was close with Dr. Vasquez and appreciated the revenue that he generated for Defendants.

69. However, Plaintiff became increasingly concerned Dr. Vasquez was endangering the lives of patients by failing to provide proper care to patients as well as properly document in the patients' medical records, and Plaintiff was further concerned that this conduct was jeopardizing Plaintiff's own medical license should CMS ever audit the underlying medical records due to Plaintiff treating some of the same Government Payor beneficiaries as Dr. Vasquez and causing duplicative bills to be submitted for the same services provided by Plaintiff.

70. In January 2025, while the supervising Nurse Practitioner, Bethany White, was visiting the IRF hospital in Knoxville, TN, Dr. Lindsay Patterson and Plaintiff complained specifically about Dr. Vasquez's failure to document as required by law, and Plaintiff further showed White several examples in the medical records of Dr. Vasquez's patients where there was little-to-no documentation, such as with respect to the physical or assessment, but nevertheless Defendants submitted those claims to Government Payors (Medicare) for payment.

71. In response to Plaintiff's complaint, the supervising Nurse Practitioner, Bethany White, suggested to Dr. Lindsay Patterson and Plaintiff that the providers begin rotating patients

daily to conceal Dr. Vasquez's improper and fraudulent conduct, and put the onus on other healthcare providers to correct Dr. Vasquez's ongoing failures to comply with Federal law.

72. Plaintiff immediately objected to the supervising Nurse Practitioner, Bethany White's suggestion that providers begin rotating patients daily because it was dangerous to the safety and wellbeing of the patients to have a different provider every day, thereby increasing the chances of medical mistakes, and because it was Dr. Vasquez's responsibility as the attending physician to complete the required documentation to justify the IRF treatment of Government Payor beneficiaries and to ensure that subsequent providers were fully apprised of the patients' conditions.

73. About two weeks later, in late-January 2025, Dr. Raul Vasquez emailed Defendants' employees working at the IRF hospital in Knoxville, TN, and copied the CEO, Jodi Czernejewski, to announce that effective immediately Defendants were implementing a new guideline to basically require all of the providers to rotate patients every day—the same exact guideline that the supervising Nurse Practitioner, Bethany White, suggested two weeks prior—under the guise that this new guideline would enhance patient care and ensure continuity, and also from that point, forward, that only one provider would attend the interdisciplinary meetings because there was no need for 2 providers to attend the same meeting, which was in direct violation of the laws and regulations determined by Government Payors.

74. In January 2025, the leadership at the IRF hospital in Knoxville, TN, began to notice the issues with Dr. Raul Vasquez's conduct, and, in or around January 20, 2025, the IRF hospital's Chief Nursing Officer emailed Defendants' employees, including CEO, Jodi Czernejewski, and Plaintiff, by stating in part: "I want to take a moment to emphasize the importance of attending and coming prepared for our daily clinical meetings. These meetings are

12

a key opportunity for us to collaborate as a team and drive high-quality patient care…."

75.     The IRF hospital's Chief Nursing Officer's above-described email on or about January 20, 2025, was in reference to Dr. Vasquez not attending the required interdisciplinary meetings for his patients—which is required by Government Payors as a condition of payment—in order to provide proper care to patients and ensure the patients are safely handed off to other providers.

76.     As a result, Plaintiff again became concerned that this new "guideline" would jeopardize the safety and wellbeing of the patients, in part, because patients would no longer be able to become familiar with their medical provider during the intensive treatment at the IRF.

77.     Defendants' other healthcare providers shared the same concerns as Plaintiff that this new "guideline" would jeopardize the safety and wellbeing of the patients.

78.     On February 9, 2025, Plaintiff emailed a letter to the founder and CEO, Jodi Czernejewski, to report Dr. Raul Vasquez's conduct, including fraudulent billing fraud and jeopardizing patient safety, and to report that this was dangerous to the company and to patients at the IRF hospital in Knoxville, TN, and that the real motive for the supervisor, Bethany White, as well as Dr. Vasquez, suggesting the new "guideline" for providers to rotate patients every day was to correct and cover up Dr. Vasquez's conduct.

79.     Leading up to and after Plaintiff submitted his letter to the CEO, Jodi Czernejewski, on February 9, 2025, Dr. Raul Vasquez submitted false claims to Government Payors for services that he never provided, but, in fact, were provided by Plaintiff.

80.     At the time, Dr. Raul Vasquez's compensation included bonuses depending on the amount of his production, with more bills submitted resulting in higher bonuses paid by Defendants.

81. In turn, on numerous occasions during his employment, Plaintiff also complained to Defendants' billing department that Dr. Raul Vasquez was submitting claims to Government Payors for services that Plaintiff actually provided and that this fraudulent conduct was causing duplicative bills to be submitted.

82. At all times material hereto, it is fraudulent and in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., for Defendants' physician to submit claims to Government Payor for services that were never actually provided by that physician.

83. At all times material hereto, it is fraudulent and in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., for Defendants' physician to submit claims to Government Payor on behalf of patients who were never actually seen or treated by that physician.

84. At all times material hereto, it is fraudulent and in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq*., for Defendants' physician to submit claims to Government Payor for services that were never documented by that physician.

85. Plaintiff's letter dated February 9, 2025 further requested that the CEO, Jodi Czernejewski, conduct an investigation into the billing fraud and patient safety related issues caused by Dr. Vasquez.

86. Plaintiff sent his letter to the CEO, Jodi Czernejewski, on February 9, 2025 in good faith.

87. Plaintiff's letter to the CEO, Jodi Czernejewski, on February 9, 2025 constitutes "protected activity" due to his efforts to stop one or more of the ongoing violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

88. Later that day, February 9, 2025, the CEO, Jodi Czernejewski, responded to Plaintiff's email and stated in part: "Let me share with Dr. Kilmer [the Chief Medical Officer]

14

and have a discussion with him around some of the details as this does involve a physician and will require a doc to doc."

89. Approximately two weeks after Plaintiff sent the letter to the CEO, Jodi Czernejewski, she scheduled a meeting on February 19, 2095, between Plaintiff, herself, and Chief Medical Officer, Dr. Jason Kilmer.

90. Thereafter, on February 19, 2025, Plaintiff attended the meeting via telephone conference with owner and CEO, Jodi Czernejewski, and Chief Medical Officer, Dr. Jason Kilmer.

91. Prior to the scheduled conference call on February 19, 2025, Plaintiff complained to Chief Medical Officer, Dr. Jason Kilmer, that Dr. Raul Vasquez typically shows up to work at 11:00 AM, when the other doctors arrived between 8:00-8:30 AM, and that it was not possible for Dr. Vasquez to treat more than 10-15 patients per day but he was billing Government Payors like Medicare for patients he was not actually treating, and, as a result, Plaintiff as the mid-level provider was being required to care for more than 50 patients during his shift.

92. In response, the Chief Medical Officer, Dr. Jason Kilmer, stated that he agreed with Plaintiff.

93. During the subsequent conference call with CEO, Jodi Czernejewski, and Chief Medical Officer, Dr. Jason Kilmer, on February 19, 2025, Czernejewski used the meeting to attack Plaintiff by accusing him of having issues at work, asserted that "complaints" had been made about Plaintiff, and otherwise retaliated against Plaintiff during this meeting.

94. Thereafter, Dr. Raul Vasquez retaliated against Plaintiff due to the letter that Plaintiff sent to the CEO on February 9, 2025 about Dr. Vasquez's inappropriate fraudulent conduct, including, but not limited to, by nitpicking Plaintiff's decisions and performance,

harassing Plaintiff, ostracizing him and treating him in a cold and dismissive manner, screaming at him, and otherwise subjecting Plaintiff to a hostile work environment. In further retaliation, Dr. Vasquez tried to set Plaintiff up for termination and/or to commit malpractice, such as, in or around April or May 2025, by pressuring Plaintiff to prematurely discharge a very sick patient who was clearly not ready for discharge due to their poor health. Plaintiff objected and refused to discharge the patient, and, in response, Dr. Vasquez asserted that the "owner," Jodi Czernejewski, "just wants us to get these patients out of" the hospital.

95. The issues regarding Dr. Raul Vasquez that Plaintiff identified in his letter on February 9, 2025, including the billing fraud, were not remedied, but instead thereafter continued up through the date of Plaintiff's termination as hereinafter described.

96. Prior to Plaintiff's termination, he also complained to management, including the CEO, Jodi Czernejewski, about Dr. Raul Vasquez's retaliatory conduct, but Plaintiff's complaints were dismissed and ignored.

97. Prior to Plaintiff's termination, he also complained to the CEO, Jodi Czernejewski, that she was retaliating against Plaintiff due to his complaints about Dr. Vasquez, but Plaintiff's complaints were ignored.

98. Prior to Plaintiff's termination, he also filed a complaint with the U.S. Department of Health and Human Resources, Office of Inspector General, regarding improper billing under Medicare, including that Dr. Raul Vasquez had "multiple times billed for notes he hasn't seen," "5-6 times he billed Medicare, other insurances[,] with no progress notes written at all," "[h]e also on hundreds of notes bills for no assessment or proper documentation," and Plaintiff further complained that he raised these concerns to the owner, "Jodi," but was ignored.

99. On information and belief, CEO, Jodi Czernejewski, knew and/or suspected that

Plaintiff reported Defendants and/or its physician, Dr. Vasquez, to the government authorities.

100.   In May 2025, CEO, Jodi Czernejewski, announced that the entity employing the employees, including Plaintiff, was being changed from "Informe Healthcare LLC" to another related entity, "Informe Healthcare Management LLC, d/b/a Informe Healthcare." (*See* Plaintiff's "First Amendment to Employment Agreement" dated May 2025, at Exhibit 3).

101.   Therefore, from May 2025, up through the date of Plaintiff's termination as hereinafter alleged, Plaintiff was also employed by "Informe Healthcare Management LLC, d/b/a Informe Healthcare."

102.   On June 26, 2025, CEO, Jodi Czernejewski, called Plaintiff to inform him that she had allegedly received "complaints" about him, and, as a result, Plaintiff was going to be moved to the "swing shift" schedule—instead of the 7 days on/7 days off schedule that Plaintiff had worked since he was initially hired by Defendants.

103.   In response, Plaintiff requested that CEO, Jodi Czernejewski, provide additional details regarding the alleged "complaints," but Czernejewski refused to provide any details about the alleged complaints or the source of the complaints.

104.   Prior to June 26, 2025, the supervising Nurse Practitioner, Bethany White, explained that employees working the "swing shift" schedule were essentially on call, received short notice before being called into work, and worked to cover other shifts as needed, such as when Defendants were otherwise short-staffed during a shift.

105.   Prior to June 26, 2025, the supervising Nurse Practitioner, Bethany White, explained that employees working the "swing shift" schedule were also required to work at Defendants' other locations in Tennessee, including at another rehabilitation center in Nashville, TN.

17

106. At all times material hereto, Defendants' employees working the "swing shift" schedule were given short notice as to when they needed to be at work to cover a shift.

107. Plaintiff was originally hired by Defendants to work the 7 days on/7 days off schedule, and he had worked that same schedule throughout his employment with Defendants.

108. CEO, Jodi Czernejewski, knew that Plaintiff needed to work 7 days on/7 days off schedule because he had other jobs that he worked during his off days, including at a hospital in North Carolina and also at a home health agency.

109. CEO, Jodi Czernejewski, knew that Plaintiff could not work for Defendants if he was put on the "swing shift" schedule because of Plaintiff's other jobs.

110. As a result, during the call with CEO, Jodi Czernejewski, on June 26, 2025, Plaintiff objected to being moved to the "swing shift" schedule because he was hired and contracted to specifically work the 7 days on/7 days off schedule, he had worked that schedule throughout his employment with Defendants, and that the swing shift schedule would prohibit Plaintiff from continuing to work his other jobs. Plaintiff further stated that Czernejewski was essentially terminating his employment because he was not available to work the swing shift schedule.

111. In response, the CEO, Jodi Czernejewski, asserted that, because of the alleged "complaints" about Plaintiff, he would see fewer patients and would be placed on the "swing shift" schedule.

112. Upon information and belief, prior to Plaintiff's termination, Defendants never conducted any investigation into Plaintiff's complaints about Dr. Vasquez's billing fraud.

113. On June 29, 2025, the CEO, Jodi Czernejewski, sent Plaintiff a letter advising that he was terminated effective immediately. (*See* Termination Letter, dated June 29, 2025, attached

18

hereto as Exhibit 4).

114. The termination letter the CEO, Jodi Czernejewski, sent to Plaintiff on June 29, 2025 (at Exh. 4) asserted, in part:

> Dear Mr. Levine:
>
> The purpose of this correspondence is to inform you of your termination of employment from inFORME Healthcare Management LLC will be effective June 29, 2025.
>
> On June 26, 2025, you were informed for a second time about customer and provider concerns as well as findings from recent audit and investigation that was discussed previously in February. During this conversation, we outlined various recent performance deficiencies, including, but not limited to, hospital patient and physician concerns, lack of teamwork and collaboration and your actions and inactions that have led to repeated non-compliance with Sections 2.2 of your Employment agreement and Medical Staff bylaws.
>
> You were informed that we needed to make a change in coverage due to the above concerns and offered you an alternative opportunity. Due to your decision to refuse work in another capacity and the request to terminate your employment we are hereby terminating your employment at the end of June 29, 2025, which is your final date to be removed from the hospital. Upon consideration of the events, inFORME has decided to invoke its right under Section 9.7, subsections (ii) and (iv) to terminate your employment effective immediately with your last day of employment being June 29, 2025.
>
> ....

(*See* Termination Letter, Exh. 4).

115. It is Defendants' position that, due to Plaintiff's alleged performance deficiencies, Defendants "needed to make a change in coverage" and Plaintiff was "offered" the "alternative opportunity" as referenced in the termination letter (at Exh. 4).

116. It is Defendants' position that the "alternative opportunity" that was "offered" to Plaintiff, as referenced in the termination letter (at Exh. 4), was to move Plaintiff to the swing shift schedule, and no longer have him working the 7 days on/7 days off schedule at the IRF hospital in Knoxville, TN.

19

117. Prior to his termination, Plaintiff's hospital or other health care entity privileges were not reduced, terminated, or suspended.

118. Prior to his termination, Plaintiff's hospital or other health care entity privileges were not placed on probation in accordance with the provisions of the bylaws, rules, or regulations of any hospital or facility.

119. Prior to his termination, Plaintiff did not engage in any conduct which was or might reasonably be considered detrimental to patient care.

120. Prior to his termination, Plaintiff did not engage in any conduct which was lower than the ethical or other professional standards of the medical community.

121. Prior to his termination, Plaintiff did not engage in any conduct which was disruptive or deleterious to the operation of Defendants or contrary to the policies or bylaws, rules, and regulations of Defendants.

122. Prior to his termination, Plaintiff was never written-up, put on a performance improvement plan, or otherwise disciplined.

123. CEO, Jodi Czernejewski, made the decision or was involved in the decision-making process to terminate Plaintiff.

124. Similarly-situated employees engaged in the exact same, or much worse, conduct than Plaintiff allegedly engaged in, but these other employees were not disciplined or terminated.

125. At all times material hereto, the Rules and Regulations of the Tennessee Department of Labor and Workforce Development, Separation Notices to be Furnished by the Employers, Chapter 0800-09-01-.02, states, in part:

> **0800-09-01-.02 SEPARATION NOTICES TO BE FURNISHED BY THE EMPLOYERS.**

(1) Whenever a worker is separated from employment for an indefinite period or for an expected duration of seven (7) days or more, the worker's employer shall furnish to such worker a Separation Notice.

    (a) The employer must supply the worker with a Separation Notice within twenty- four (24) hours after the worker's separation from employment.

    (b) The employer must use the Separation Notice supplied by the Department and the employer must complete the information required on the form.

126. After Plaintiff's termination up to the date of this filing, Defendants never provided Plaintiff with the Separation Notice as required by Tennessee Rule and Regulation, Chapter 0800-09-01-.02(1).

127. During Plaintiff's employment, Defendants presented and/or caused other healthcare providers to present false or fraudulent claims that were thereafter paid and/or approved by Government Payors, including Medicare, in violation of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, 18 U.S.C. § 287 (False, Fictitious, or Fraudulent Claims), and 18 U.S.C. § 1347 (Health Care Fraud), among other statutes.

128. Defendants are responsible and liable for the retaliatory actions of its agents and employees under the doctrine of respondent superior and under agency principles.

129. As a result of Defendants' illegal conduct, the Plaintiff has lost tangible job benefits, including a loss of income and benefits, both past and future, and other pecuniary losses, and Plaintiff has further suffered, and will continue to suffer, emotional distress, humiliation and embarrassment, damage to reputation and character.

130. This suit is timely filed.

### COUNT I – False Claims Act, 31 U.S.C. § 3730(h)

131. Plaintiff incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

132. Under the False Claims Act, 31 U.S.C. § 3730(h), a person may bring an action in Federal District Court for himself against employers or contractors like Defendants if that person is discharged, demoted, suspended, threatened, harassed, or otherwise discriminated against in the terms and conditions of employment because of lawful acts done by him in furtherance of an action under 31 U.S.C. § 3729, *et seq.*, or other efforts to stop one or more violations of 31 U.S.C. § 3729, *et seq.*

133. As set forth above, Defendants retaliated against Plaintiff in the terms and conditions of his employment because of lawful acts done by him and other efforts to stop one (1) or more violations of the False Claims Act. In turn, Plaintiff was ultimately fired for trumped up reasons on June 29, 2025, much to his financial detriment, emotional distress, humiliation, and embarrassment.

134. Pursuant to 31 U.S.C. § 3730(h), Plaintiff is entitled to compensatory and special damages, including back pay and front pay (or, in the alternative, reinstatement if the Court deems it appropriate), two times the amount of backpay with interest, punitive damages, prejudgment interest, litigation costs, attorneys' fees, a jury to try this cause, and other injunctive relief as deemed appropriate by the Court.

<u>**COUNT II – Breach of Contract**</u>

135. Plaintiff incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

136. Under Tennessee and/or Wisconsin law, Plaintiff had an enforceable employment agreement (at Exh. 1), including the amendments thereto dated December 15, 2023 (at Exh. 2) and dated May 2025 (at Exh. 3).

137. Defendants breached the employment agreements by engaging in the fraudulent

conduct described herein, unilaterally changing or attempting to change Plaintiff's schedule and work assignment, and then terminating Plaintiff for a trumped-up reason.

138. Contrary to the Termination Letter (at Exh. 4), Plaintiff did not engage in conduct to justify terminating his employment pursuant to Section 9.7, subsections (ii) and (iv) of the Employment Agreement dated March 20, 2022 (at Exh. 1).

139. Prior to his termination, Plaintiff did not engage in conduct set forth in Section 9.7, subsections (ii) of the Employment Agreement (at Exh. 1) which allows immediate termination of Plaintiff for "(ii) the reduction, termination, or suspension of Employee's hospital or other health care entity privileges at any hospital or health care entity or Employee is placed on probation in accordance with the provisions of the bylaws, rules, or regulations of any hospital or facility…." (*See* Exh. 1).

140. Prior to his termination, Plaintiff did not engage in conduct set forth in Section 9.7, subsections (iv) of the Employment Agreement (at Exh. 1) which permits immediate termination of Plaintiff for "(iv) the loss of Employee's medical competence, conduct, and/or judgment which are or might reasonable be considered detrimental to patient care or which are lower than the ethical or other professional standards of the medical community or are disruptive or deleterious to the operation of inFORME or contrary to the policies or bylaws, rules, and regulations of inFORME…." (*See* Exh. 1).

141. Under Tennessee and/or Wisconsin law, Plaintiff is entitled to compensatory and other pecuniary damages to the fullest extent permitted by law, including back pay and front pay.

## **JURY DEMAND**

142. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for all triable claims asserted in this Complaint.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, the Plaintiff prays for judgement against the Defendants, and Plaintiff prays for the following relief:

1.     Compensatory damages, including front pay (or, in the alternative, reinstatement if the Court deems it appropriate);

2.     Two times the amount of backpay;

3.     Prejudgment interest;

4.     Reasonable attorney's fees;

5.     Costs of this action; and

6.     Appropriate injunctive relief ordering Defendants to cease and desist engaging in fraudulent practices.

RESPECTFULLY SUBMITTED, this the <u>29th</u> day of July, 2026.

**AMY F. SCARR, S.C.**

s/*Amy F. Scarr*
Amy F. Scarr
State Bar No. 1016179
Attorney for Plaintiff
Amy F. Scarr, S.C.
5201 E. Terrace Dr., Suite 375
Madison, WI  53718
Telephone: (608) 255-6610
Email: attorneyamyscarr@gmail.com

**THE BURKHALTER LAW FIRM, P.C.**

David A. Burkhalter, II, TN BPR #004771*
D. Alexander Burkhalter, III, TN BPR #033642*
Zachary J. Burkhalter, TN BPR #035956*
Attorneys for Plaintiff
P.O. Box 2777
Knoxville, Tennessee 37901
(865) 524-4974

Email: david@burkhalterlaw.com
Email: alex@burkhalterlaw.com
Email: zach@burkhalterlaw.com

*Pending approval of applications to be
admitted to the E.D. of Wisconsin*